Shaun Setareh (SBN 204514)
  shaun@setarehlaw.com
Thomas Segal (SBN 222791)
  thomas@setarehlaw.com
H. Scott Leviant (SBN 200834)
  scott@setarehlaw.com
SETAREH LAW GROUP
315 S. Beverly Dr., Suite 315
Beverly Hills, California 90212
Telephone (310) 888-7771
Facsimile (310) 888-0109

Attorneys for Plaintiff
JOHN UTNE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN UTNE, on behalf of himself, all others similarly situated, and the general public,<br><br>    *Plaintiff*,<br><br>    v.<br><br>HOME DEPOT U.S.A., INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>    *Defendants*. | Case No. 3:16-cv-01854-RS<br><br>**CLASS ACTION**<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**<br><br>Date:        December 13, 2018<br>Time:       1:30 p.m.<br>Location:   Courtroom 3<br><br>Action Filed:   March 8, 2016 |

TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF RELEVANT AND UNDISPUTED FACTS ..................................3

    A.    Defendant's Written Policies, and 30(b)(6) and Class Member Testimony All
        Confirm That Class Members Are Subject to Home Depot's Control During Off-
        the-Clock Time at the Start of Every Shift and at the End of Shifts Terminating
        After a Store Closes ..................................................................................... 4

        1.    Home Depot's Written Policies, and 30(b)(6) and Class Member Testimony
              All Confirm That Home Depot Places Class Members Under Its Control
              When They Enter a Store, Requiring Work Before Clocking in for a Shift ........ 4

        2.    Home Depot Locks in Employees Working Shifts That End After Stores
              Close, and Then Holds Those Employees Without Pay After They Clock Out .. 6

    B.    Off-the-clock Labor in Home Depot Stores Occurs Throughout California ................ 7

    C.    Home Depot Knows That Off-the-Clock Work Occurs ............................... 8

    D.    Despite Discovery Requests That Should Have Resulted in the Production, Home
        Depot Has Submitted No Evidence That It Made Payments for Off-the-Clock Time
        Spent Waiting to Be Released from Locked Stores .................................................... 10

        1.    Plaintiff's Interrogatory 4 (Set Two) and Request for Production 4 .................. 10

        2.    Plaintiff's Interrogatory 10 ................................................................................... 11

    E.    Home Depot Uses a Sophisticated Kronos System as the Timeclock to Track
        Employee Time ............................................................................................. 11

III.   DISCUSSION ......................................................................................................12

    A.    Resolution of the Liability Issue, Separate from Classwide Damages, Is Authorized
        Under Both Fed. R. Civ. P. 56 and Class Action Management Jurisprudence........... 12

        1.    The Standard for Motions for Summary Judgment/Adjudication...................... 12

        2.    Courts Managing Class Actions Routinely Bifurcate Liability and Damages
              to Efficiently Manage Issues............................................................................... 13

B.   The "Control" Element of the California Wage Orders' Disjunctive Compensation Test Resoundingly Supports Plaintiff's Motion, Due to the Expansive Meaning of "Control" Incorporated into California's Wage Laws ................................................. 14

C.   Defendant Exercised Control Over the Members of the Class When, As a Matter of Policy, It Directed Their Pre-Clock In Activity, Thereby Assuming an Obligation to Compensate the Class Members for All Such Time Spent Under Its Control ....... 17

D.   Defendant Exercised Control Over the Members of the Lock-In Class When, As a Matter of Policy, It Precluded Them from Leaving the Store at Night Immediately After Clocking Out, Thereby Assuming an Obligation to Compensate the Lock-In Class Members for All Such Time Spent Under Its Control ...................................... 19

E.   Pursuant to Recent California Supreme Court Authority, a De Minimis Defense Is Not Available to Home Depot, Since Very Short Periods of Time That Can be Captured or Occur Regularly Must Be Compensated ................................................ 21

IV.   CONCLUSION...........................................................................................................................24

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1

TABLE OF AUTHORITIES

2

3  **FEDERAL CASES**

4  *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D. Cal. 1994),

5      *as amended on denial of reconsideration* (Sept. 15, 1994) ........................................................ 13

6  *Arthur Young & Co. v. U. S. Dist. Court*, 549 F.2d 686 (9th Cir. 1977) ...................................... 13

7  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 12

8  *Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1982) ...................................................... 22, 23, 24

9  *Lopez v. G.A.T. Airline Ground Support, Inc.*, No. 09CV2268-IEG BGS,

10      2010 WL 3633177 (S.D. Cal. Sept. 13, 2010) ........................................................................ 13

11  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ..................................................................... 12

12  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................. 12

13  *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623 (9th Cir. 2018) ........................................... 1, 2, 14

14  *Time Warner Entertainment-Advance/Newhouse Partnership v. Steadfast Orchard Park, L.P.*,

15      No. ED CV 07-473, 2008 WL 4350054 (E.D. Cal. Sept. 23, 2008) ......................................... 12

16

17  **CALIFORNIA CASES**

18  *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 385 P.3d 823 (2016),

19      *as modified on denial of reh'g* (Mar. 15, 2017) ...................................................................... 21

20  *Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968 (1995) ........................................ 17, 19

21  *Francais v. Somps*, 92 Cal. 503 (1891) ..................................................................................... 21

22  *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal.App.4th 1524 (2008) ......................................... 17

23  *Monzon v. Schaefer Ambulance Service, Inc.*, 224 Cal. App. 3d 16 (1990) .............................. 14

24  *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (2000) ................................................ 1, 2, 14, 16

25  *Stafford v. Realty Bond Service Corp.*, 39 Cal.2d 797 (1952) ................................................. 15

26  *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557 (1996) ...................................... 14

27  *Troester v. Starbucks Corp.*, 5 Cal. 5th 829 (2018), *as modified on denial of reh'g* (Aug. 29, 2018) . passim

28  *Viking Pools, Inc. v. Maloney*, 48 Cal.3d 602 (1989) .............................................................. 15

Case No.: 3:16-cv-01854-RS      Page iii      *Utne v. Home Depot U.S.A., Inc.*

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES
AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1

2      **STATUTES**

3      Labor Code § 1173 ............................................................................................................... 14

4      Labor Code § 1178.5 ............................................................................................................ 14

5      Labor Code § 1182 ............................................................................................................... 14

6

7      **REGULATIONS**

8      24 C.F.R. § 785.47.....................................................................................................22, 23, 24

9      Cal. Code Regs., tit. 8, § 11140, subd. 2(G) ..........................................................................1

10

11     **RULES**

12     Fed. R. Civ. P. 30(b)(6).............................................................................................. 5, 8, 11

13     Fed. R. Civ. P. 56(c) ........................................................................................................ 12

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 3:16-cv-01854-RS                          Page iv                          *Utne v. Home Depot U.S.A., Inc.*

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES
AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1    TO THE COURT, TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

2            PLEASE TAKE NOTICE that on December 13, 2018, at 1:30 p.m. or as soon thereafter as may be

3    heard, in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA

4    94102, Plaintiff will and hereby does move this Court for an Order granting partial summary judgment

5    pursuant to Fed. R. Civ. P. 56(a) as follows:

6            1.    Finding Defendant liable to the Hourly Employee Class as to the First Claim for Relief (unpaid

7                  hourly wages) in the Third Amended Complaint; and,

8            2.    Finding Defendant liable to the Lock-In Class as to the First Claim for Relief (unpaid hourly

9                  wages) in the Third Amended Complaint.

10           This motion is based upon this Notice, the Memorandum of Points and Authorities filed in support

11   thereof, the declaration filed herewith as well as the exhibits thereto, the pleadings and records on file in this

12   action, and such additional argument and evidence as may be presented at the hearing on this motion.

13

14   **I.    <u>INTRODUCTION</u>**

15           In this certified class action, Plaintiff now moves for partial summary judgment against Defendant

16   Home Depot U.S.A., Inc. ("Home Depot" or "Defendant") on the First Claim for Relief in the Third

17   Amended Complaint ("TAC") as to both the Hourly Employee Class and the Lock-In Class ("the Classes").

18   The record in this case establishes, through Defendant's own testimony and documentary evidence it

19   produced in discovery in this matter, along with confirming declarations of Class Members and others

20   obtained by both Plaintiff and Defendant, that Home Depot proclaimed and exercised control over Class

21   Members in a homogenous manner without compensating Class Members for all of that off-the-clock time

22   spent under Home Depot's *control*.

23           "Control" is one of the independent touchstones triggering an employer's obligation to compensate

24   under California law, and its undisputable presence compels summary adjudication of the wage liability issue

25   here.  "[C]ompensable time is 'the time during which an employee is subject to the control of an employer,

26   and includes all the time the employee is suffered or permitted to work, whether or not required to do

27   so.' " *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 637 (9th Cir. 2018), citing *Morillion v. Royal Packing*

28   *Co.*, 22 Cal. 4th 575, 578 (2000) (quoting Cal. Code Regs., tit. 8, § 11140, subd. 2(G)).  The standard is

expressed in the *disjunctive*, meaning that "time is compensable when an employee is working *or* under the control of his or her employer." *Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578.  Thus, California's compensable-time standard encompasses two categories of time:

> First, time is compensable if an employee is "under the control" of his or her employer, whether or not he or she is engaging in work activities, ***such as by being required to remain on the employer's premises or being restricted from engaging in certain personal activities***.

*Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578 (emphasis added).  Significant to this Motion, "an employee who is subject to an employer's control does not have to be working during that time to be compensated. . . ." *Morillion*, 22 Cal. 4th at 582.  "Second, time is compensable if an employee 'is suffered or permitted to work, whether or not required to do so.'" *Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578.  Home Depot's decision to control the Class while off-the-clock leads, inescapably, to but one outcome, a liability decision in Plaintiff's favor as to the First Claim for Relief in the TAC.

There are only a handful of related questions to be decided in connection with this Motion, namely: (1) Did Home Depot assert control over the Hourly Employee Class members before they clocked in to start their shifts? (2) If Home Depot did assert control over the Hourly Employee Class members before they clocked in to start their shifts, is it liable for unpaid wages owed on that off-the-clock time?  (3) Did Home Depot assert control over the Lock-In Class members at the end of their shifts as a result of its policy to lock Home Depot stores at night after the stores closed to the public?  (4) If Home Depot did assert control over the Lock-In Class members at the end of their shifts as a result of its policy to lock Home Depot stores at night after the stores closed to the public, is it liable for unpaid wages owed on that off-the-clock time?  These issues plainly can and should be answered in Plaintiffs' favor now.[1]  While the Parties certainly dispute the amount of classwide damages for unpaid wages owed to each of the Classes, this regularly occurring, unpaid time is unquestionably compensable, whether Plaintiff's view or Defendant's view of the amount of that time – a *damages question* – proves more accurate.

As if predicting the contours of this very Motion, this Court's Order certifying the Hourly Employee Class and the Lock-In Class identified the common question of "control," as well as observing that

---

[1] The Court should recall Home Depot's floundering denials of its own written policies during the hearing of Plaintiff's Motion for Class Certification.  Home Depot's position as to its own mandates was nothing short of farcical.

aberrational experiences by Home Depot's cherry-picked declarants was nothing more than a damages

question that would not preclude classwide proof of liability:

> With respect to the Hourly Employee Class, Home Depot's liability may be determined through answers to questions common to the class. Whether the location of time clocks requires employees to walk across the store to clock in, and whether that time is compensable, are questions that are amenable to class resolution. As to the proposed Lock-In Class, whether the locking of store doors at closing causes employees to remain under the ***control*** of Home Depot after clocking out and before exiting the store is a common question that is subject to common proof. For both proposed classes, the key question of whether the alleged pre-shift and post-shift time is more than de minimus may be resolved on a class-wide basis. Although Home Depot argues that specific amounts of uncompensated time will vary from class member to class member, ***the existence of individual inquiries as to damages is not sufficient to defeat class certification***.

(Dkt., 92, at 11, emphasis added.)

Because the question of liability for unpaid, off-the-clock work cannot reasonably be disputed by

Home Depot, partial summary judgment on the issue of liability should be granted in favor of the Classes as

to the First Claim for Relief in the TAC.

## II.    STATEMENT OF RELEVANT AND UNDISPUTED FACTS

The following facts, as discussed in detail below, are beyond dispute and support a finding of liability

on behalf of the Classes as to the First Claim for Relief in the TAC:

- Home Depot has an express, written policy requiring employees to retrieve and don their apron *before* clocking in for their shifts.

- Class Members were aware of the policy requiring employees to retrieve and don their apron *before* clocking in for their shifts.

- Class Members overwhelmingly complied with the policy requiring employees to retrieve and don their apron *before* clocking in for their shifts.

- Home Depot has an express, written policy instructing employees that they can *only* be in a Home Depot store when working or shopping: "***Associates are not permitted to remain in the store unless they are working or shopping***."

- Home Depot has an express, written security policy requiring Home Depot stores to lock *all* doors after closing to the public.

- Class Members overwhelmingly experienced off-the-clock time waiting to be released from

Home Depot stores as a result of the security policy requiring Home Depot stores to lock *all* doors after closing to the public.

- Home Depot was aware that, as a result of the security policy requiring Home Depot stores to lock *all* doors after closing to the public, Class Members experienced off-the-clock time waiting to be released from Home Depot stores.

- Home Depot knows precisely when Class Members have clocked in and out for their shifts because it uses Kronos, a sophisticated digital timeclock system.

- Home Depot's timeclock is customarily located at the back of the store, and Home Depot is unaware of any timeclocks being located at the front of a store.

- Home Depot expressly states that the burden of accurate wage payments rests on employees, not Home Depot.

A.  **Defendant's Written Policies, and 30(b)(6) and Class Member Testimony All Confirm That Class Members Are Subject to Home Depot's Control During Off-the-Clock Time at the Start of Every Shift and at the End of Shifts Terminating After a Store Closes**

    1.  **Home Depot's Written Policies, and 30(b)(6) and Class Member Testimony All Confirm That Home Depot Places Class Members Under Its Control When They Enter a Store, Requiring Work Before Clocking in for a Shift**

As expressly declared by Home Depot's written policy, Associates are only allowed to be in a Home Depot store to work or shop: "***Associates are not permitted to remain in the store unless they are working or shopping.***" (Leviant Decl., Exh. 4, at Bates No. HD-UTNE-0001104.)  Through this policy, Home Depot asserts an immediate right to control Associates who enter a Home Depot store for any reason other than as a member of the shopping public.  Fully consistent with that policy pronouncement, according to the Home Depot Associate Orientation Guide produce by Home Depot in this matter, Home Depot associates must follow a set routine when they enter a Home Depot store:

> ***Remember that you should arrive fully prepared to begin your shift. In stores, associates should put on their aprons just before clocking in.***

(Leviant Decl., Exh 4 (emphasis added).)  As explained by Christine Pennington, Senior Director of Employment Practices and Associate Relations for The Home Depot, the application of this policy is clear. Associates must first get their Home Depot aprons and then clock in at the timeclock: "When an associate arrives at the start of their shift, they need to go to the back, get their apron, put it on, go to the time clock and clock in."  (Leviant Decl., Exh 2: Pennington Depo., at 37:7-10.)

Because of the location of the timeclock, the shift start procedure requires associates to walk through the entire store to the timeclock:

> **Q**.  Where is the time clock located?
>
> **A**.  It depends on the store, but typically the time clock is in the rear of the store either in the break room or in the hallway that leads to the break room where the lockers are.· Again, it depends on the store configuration.
>
> **Q**.  Is the time clock ever in the front of the store?
>
> **A**.  Not typically, not to my knowledge.

(Leviant Decl., Exh 2: Pennington Depo., at 33:5-13.)  And, as admitted by Home Depot at its deposition, associates retrieve and then don their aprons *before* clocking in for their shifts:

> **Q**.  What does it mean when it says, "In stores, associates should put on their aprons just before clocking in"?  That's at the top of the page, how to clock in.
>
> **A**.  So these are hourly and, again, this is an orientation guide from 2013.· And we have other ·businesses that are not stores.· So it says, "In stores, associates should put on their apron just before clocking in."· I'm not sure if in 2013 this was the guide that was being used for both stores and non-stores.· But what that means is, if you work in a store, you need to go to the back, go to your locker, put your apron on and then immediately go to clock -- clock in.
>
> **Q**.  So as soon as somebody enters a store, they should be going towards the time clock to clock in?
>
> **A**.  Typically, yes, they should be going to get their apron and then go to clock in.

(Leviant Decl., Exh 2: Pennington Depo., at 35:7-25.)**[2]**  Associates are not provided a grace period for personal activity after clocking in for work:

---

**[2]** Despite written policies *stating* this procedure and Rule 30(b)(6)  testimony *admitting* this procedure, Defendant previously produced some declarations in which *current* employees claimed to do the exact opposite of the longstanding policy and declared procedure.  Those aberrations do not impact class liability for uncompensated time at the start of a shift, and such declarations should be viewed for what they are – sham declarations contradicting deposition testimony.  Anecdotal denials of compliance with Home Depot policy cannot create a triable issue in opposition to partial summary judgment as to classwide liability for uncompensated off-the-clock time at the start of shifts.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1

**Q**. And are they supposed to start working immediately?

2

**A**. If an associate is on the clock, then they need to be performing their tasks.

3

(Leviant Decl., Exh 2: Pennington Depo., at 40:1-4.)

4

Class members confirm that they suffered under these policies, stating uniformly that they are placed

5

under Defendant's control when they enter the store, following instructions to go to the employees' areas in

6

the *rear* of the store, put on their Home Depot apron, and *then* clock in.[3]  Class members state that the time

7

they spent off-the-clock at the start of every shift ranged from a few minutes at the lowest end up to more than

8

ten minutes at the highest end. *Id.*  All of that off-the-clock time under Home Depot's control at the start of a

9

shift – whether two minutes, five minutes, or more – is compensable time.

10

11
      **2.**      **Home Depot Locks in Employees Working Shifts That End After Stores Close,**

12
                **and Then Holds Those Employees Without Pay After They Clock Out**

13

Once a Home Depot Store closes to the public for the evening, Home Depot policy mandates that all

14

doors must be locked: "***At closing, all doors must be locked***."  (Leviant Decl., Exhs. 5, 78-81, at p. 6 of each

15

(Emphasis added.))  Once locked, a limited number of supervisors have a key to let employees out:

16

    **Q**. (By Mr. Setareh)· Can -- can there only be -- is it only that the manager and supervisor
    can let people out?

17

18

    **A**. Typically, it's whoever has keys. And typically, it is either the store manager, if the store
    manager is closing, the assistant store manager or key-carrying supervisor.  And again, I
    think it depends on the size of the store, number of associates, how many individuals they
    would have at a closing shift that would be available with keys to open the door.

19

20

(Leviant Decl., Exh 2: Pennington Depo., at 50:8-18.)

21

Members of the Lock-in Class were instructed to clock out, *then* put away their apron, *then* travel to

22

23
[3] *See, e.g.,* Leviant Decl., Exhs. 7-53, at Alvarez Decl., ¶ 5-6; Anchondo Decl., ¶ 5-6; Anderson Decl.,
¶ 6-7; Andia Decl., ¶ 6; Andrade Decl., ¶ ; Angel Decl., ¶ 5-6; Caballero Decl., ¶ 5-6; Calderon Decl., ¶ 5-

24
6; Camacho Decl., ¶ 5-6; Chong Decl., ¶ 5-6; Choy Decl., ¶ 6-7; Chriss Decl., ¶ 6-7; Cullen Decl., ¶ 6-7;
Daniel Decl., ¶ 5-6; Danti Decl., ¶ 5-6; Darish Decl., ¶ 6-7; Doshi Decl., ¶ 5-6; Duke Decl., ¶ 5-6;

25
Duntsch Decl., ¶ 6-7; Duran Decl., ¶ 5-6; Eaton Decl., ¶ 6-7; Gates Decl., ¶ 6-7; Gillespie Decl., ¶ 5-6;
Hackelton Decl., ¶ 5-6; Hammonds Decl., ¶ 5-6; Hedger Decl., ¶ 6-7; Henley Decl., ¶ 5-6; Hill Decl., ¶ 6-

26
7; Lee Decl., ¶ 6-7; Love Decl., ¶ 5-6; Lujano Decl., ¶ 5-6; Malone Decl., ¶ 5-6; Partida Decl., ¶ 5-6;
Rivera Decl., ¶ 5-6; Sinjem Decl., ¶ 5-6; Steeven Decl., ¶ 5-6; Stein Decl., ¶ 5-6; Stith Decl., ¶ 5-6; Stone

27
Decl., ¶ 6-7;Stroughn Decl., ¶ 5-6; Topete Decl., ¶ 6-7; Wong Decl., ¶ 5-7; Wood Decl., ¶ 5-6; Wray
Decl., ¶ 6-7; Wright Decl., ¶ 6-7; Zafari Decl., ¶ 5-6; Zarate Decl., ¶ 5-6.  *See also,* Exh. 6, at Utne Decl.,

28
¶ 4-5.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED
CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

the front of the store where they would either wait with other departing employees until a manger let them out of the locked store or would page a manager with a key to let them out of the locked store.[4] In either case, associates estimated spending substantial amounts of time off-the-clock waiting to be released. *Id.*

> **B.    Off-the-clock Labor in Home Depot Stores Occurs Throughout California**

Off-the-clock labor is not an issue limited to a few "renegade" Home Depot stores. Class Members report problems with off-the-clock labor in Home Depot stores throughout California, including stores located in, among others, the following cities: Covina, Huntington Park, Mira Mesa, Santee, Burbank, Panorama City, Van Nuys, Riverside, Victorville, Laguna Hills, Glendale, Napa, Salinas, Fremont, Chula Vista, San Diego, Santa Clarita, Goleta, Rancho Cordova, Chino, Perris, South Fontana, Fullerton, Redlands, San Jose, Campbell, Rancho Mirage, Santee, Victorville, Garden Grove, La Habra, La Mirada, Fresno, San Rafael, Pittsburg, El Monte, Hayward, Los Angeles, Irvine, Hercules, Hanford, Selma, Lemon Grove, Anaheim, San Luis Obispo, and Anaheim Hills.[5]

---

[4] Class Members estimates spending *five* or more waiting to be released from the locked store at the end of a closing shift, and wait times were estimated to be as high as 30 minutes on a few occasions. *See, e.g.,* Leviant Decl., Exhs. 7-53, at Alvarez Decl., ¶ 11-12 (5-10 mins.); Anchondo Decl., ¶ 13-14 (15 mins.); Anderson Decl., ¶ 12-13 (5-8 mins.); Andia Decl., ¶ 9 (15 mins.); Andrade Decl., ¶ 11-12 (10-20 mins.); Angel Decl., ¶ 13-14 (5-10 mins.); Caballero Decl., ¶ 11-12 (8-15 mins.); Calderon Decl., ¶ 12-13 (5-10 mins.); Camacho Decl., ¶ 13-14 (5-15 mins.); Chong Decl., ¶ 11-12 (5-15 mins.); Choy Decl., ¶ 12-13 (10-20 mins.); Chriss Decl., ¶ 12-13 (5-8 mins.); Cullen Decl., ¶ 10-11 (5-10 mins.); Daniel Decl., ¶ 11-12 (5-15 mins.); Danti Decl., ¶ 12-13 (5-10 mins.); Darish Decl., ¶ 12-13 (5-20 mins., sometimes up to 30 mins.); Doshi Decl., ¶ 13-14 (10-15 mins.); Duke Decl., ¶ 10-11 (5-10 mins.); Duntsch Decl., ¶ 12-13 (5-10 mins.); Duran Decl., ¶ 11-12 (5-15 mins.); Eaton Decl., ¶ 12-13 (5-10 mins.); Gates Decl., ¶ 11-12 (10-20 mins.); Gillespie Decl., ¶ 11-12 (5-10 mins.); Hackelton Decl., ¶ 11-12 (15 mins., 20-30 mins. occasionally); Hammonds Decl., ¶ 11-12 (5-10 mins.); Hedger Decl., ¶ 12-13 (30 mins.); Henley Decl., ¶ 11-12 (5-15 mins.); Hill Decl., ¶ 11-12 (10-20 mins.); Lee Decl., ¶ 12-13 (usually 5-7 mins., up to 10-12 mins.); Love Decl., ¶ 11-12 (5-20 mins.; average 10 mins.); Lujano Decl., ¶ 12-13 (10 mins.); Malone Decl., ¶ 11-12 (10-20 mins.); Partida Decl., ¶ 11-12 (5 mins.); Rivera Decl., ¶ 12-13 (5-20 mins.; average 15 mins.); Sinjem Decl., ¶ 11-12 (at least 10 mins.); Steevens Decl, ¶ 11-12 (5-15 mins. on average, and up to 20 mins.); Stein Decl., ¶ 11-12 (5-10 mins.); Stith Decl., ¶ 11-12 (5-10 mins.; average 10 mins.); Stone Decl., ¶ 12-13 (average 10 mins; low of 5 and high of 30 mins.); Strough Decl, ¶ 10-11 (10-20 mins.); Topete Decl., ¶ 12-13 (5-7 mins. on average, and up to 15-20 mins.); Wong Decl., ¶ 10-11 (10 mins. on average, up to 20 mins.); Wood Decl., ¶ 11-12 (at least 5 mins., up to 20 mins.); Wray Decl., ¶ 14-15 (5-10 mins.); Wright Decl., ¶ 12-13 (15 mins. on average); Zafari Decl., ¶ 13 (waiting for manager to *open* store); Zarate Decl., ¶ 9-10 (at least 15-20 mins., and up to 30 mins.). *See also,* Exh. 6, at Utne Decl., ¶ 7-8 (up to 20 mins.).

[5] *See, e.g.,* Leviant Decl., Exhs. 7-53, at Alvarez Decl., ¶ 2; Anchondo Decl., ¶ 2; Anderson Decl., ¶ 2-3; Andia Decl., ¶ 2-3; Andrade Decl., ¶ 5-6; Angel Decl., ¶ 2; Caballero Decl., ¶ 2; Calderon Decl., ¶ 2; Camacho Decl., ¶ 2; Chong Decl., ¶ 2; Choy Decl., ¶ 2-3; Chriss Decl., ¶ 2-3; Cullen Decl., ¶ 2; Daniel Decl., ¶ 2; Danti Decl., ¶ 2; Darish Decl., ¶ ; Doshi Decl., ¶ 2; Duke Decl., ¶ 2; Duntsch Decl., ¶ 2-3; Duran Decl., ¶ 2; Eaton Decl., ¶ 6-7; Gates Decl., ¶ 2-3; Gillespie Decl., ¶ 2; Hackelton Decl., ¶ 2;

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

In this matter, aware that off-the-clock wait time occurs on closing shifts, Defendant produced declarations that focused on the class damages issue of *how much* waiting time occurs in closing shifts, rather than attempting to demonstrate that Home Depot does not lock its stores after closing at night. Of Defendant's 40 declarations produced in this matter to date that claim any familiarity with closing shifts practices, six are managerial and control their own ability to leave a store (5 ASMs, and 1 Manager-on-Duty).[6] Of the 34 non-managers, 21, *or 61% of Defendant's own declarants*, claim to have experienced some lock-in waiting time, but these *current* employees all claim that they didn't *request* compensation for their lock-in wait time (as if it was their obligation to do so), saying either that it was not long enough to matter to them, or nothing about whether they requested compensation after admitting to lock-in wait time.  (*See,* Leviant Decl., Exh. 54-74 (21 declarants *admitting* lock-in waiting time occurred).)

## C.   Home Depot Knows That Off-the-Clock Work Occurs

Home Depot *knows* that Lock-in Class members spend time waiting off-the-clock to be released because, according to Home Depot, associates needing to be released from the locked store can "go to the front of the store and wait for the manager or page the manager using either what's called a first phone or the overhead paging system that they're there. . ." (Leviant Decl., Exh 2: Pennington Depo., at 51:19-24.)[7]

---

Hammonds Decl., ¶ 2; Hedger Decl., ¶ 2-3; Henley Decl., ¶ 2; Hill Decl., ¶ 3; Lee Decl., ¶ 2-3; Love Decl., ¶ 2; Lujano Decl., ¶ 2; Malone Decl., ¶ 2; Partida Decl., ¶ 2; Rivera Decl., ¶ 2; Sinjem Decl., ¶ 2; Steevens Decl., ¶ 2; Stith Decl., ¶ 2; Stone Decl., ¶ 2-3; Stroughn Decl., ¶ 2; Topete Decl., ¶ 2-3; Wong Decl., ¶ 2; Wood Decl., ¶ 2; Wray Decl., ¶ 2-3; Wright Decl., ¶ 2-3; Zafari Decl., ¶ 2; Zarate Decl., ¶ 2.

[6] It is also notable that Defendant, which has access to every store in California, produced declarations from employees working at about 14 stores on the issue of closing procedures. It is also notable that the claimed closing procedures at those stores are (a) different from the **47** stores represented by the declarations provided by Plaintiff, and, in some cases, are (b) violative of Home Depot's *written* security policy.  (Leviant Decl., Exhs. 5, 78-81, at p. 6 of each.)

[7] Home Depot cannot escape liability by self-servingly claiming that, despite having comprehensive and detailed written policies, it has additional, unwritten policies that it claims fix the systemic violations that result from the written policies when its Fed. R. Civ. P. 30(b)(6) witness cannot provide an actual foundation for that claim or any detail about it. For example, Home Depot claimed that even though associates are instructed to clock out at the timeclock in the back of the store *in writing*, it has an *unwritten practice* of allowing associates waiting to be released to clock out on a computer that is not normally used as a timeclock.  (Leviant Decl., Exh 2: Pennington Depo., at 56:20 – 57:16.)  But after claiming that practice exists, Home Depot could not state when that unwritten practice was implemented, or anything about the scope of implementation. Sham testimony does not raise triable issues of fact. Moreover, scores of declarants submitted by Plaintiff are unfamiliar with this alleged practice, confirming the sham nature of the claim.

Moreover, Home Depot previously obtained and produced declarations confirming, without question, that Home Depot is broadly aware that its policies result in uncompensated, off-the-clock work by associates. For example, Declarant Alvarez declares that, at times, he has to wait, alone or with other employees, to be released from his store.

> 6. About once a month, however, there is no manager by the door when I leave, so I need to wait for someone to let me out of the building. If I am waiting with another associate, I page a manager so that we can leave the building. The longest I have had to wait on these shifts is about five minutes, but it is usually only a minute a two.

> 7. ***If I am waiting by myself, however, I often do not want to bother anyone, so I just wait for a manager to walk by.*** I know I could page a manager like I ordinarily do when I am waiting with another associate, but it is my choice not to. In those circumstances, the longest I have ever waited is about ten minutes, and usually it's only a few minutes. ***No manager is aware that I am waiting, because I choose not to call them***.

> 8. In my experience, there's no way to predict when I will need to wait for a manager to let me out of the store.

> 9. I do not fill out a time and attendance form for the few minutes I spend waiting to be let out of the store, because it is such a short wait, I don't mind. When all of my shifts are considered, I only spend about five minutes per month in total waiting to be let out of the store.

(Alvarez Decl., Dkt. 78-5, at ¶¶ 6-9, emphasis added.) And, while Declarant Alvarez gratuitously offers that "No manager is aware that I am waiting," this is demonstrably false, as he also states that he will "just wait for a manager to walk by" when waiting alone. As a matter of simple logic, the manager can observe that he is waiting to be let out. Thus, declarations collected by Home Depot prove that it knew or should have known when Alvarez was observed, alone or with others waiting to be released, that uncompensated time under Home Depot's control occurred. Home Depot was reminded of this when its own attorneys collected the Alvarez Declaration. Where is the evidence that Home Depot paid him or any other class member for such time? None was produced in discovery and none was provided with Home Depot's opposition to Plaintiff's Motion for Class Certification.

In another example, Declarant Alonzo also attempts to shift to himself the obligation of Home Depot to pay for off-the-clock time it knew or should have known was occurring:

> 2. I work about three or four closing shifts per week, although sometimes I work fewer closing shifts. As an hourly employee, I use the employee time clock to record my work time. If I ever need to adjust my work time, I use a time and attendance form to record work time not captured by the time clock. ***I would also use the time and attendance forms to record any time spent waiting to be let out of the store. However, since I have never had to wait more than a few minutes to be let out of the store, I have not bothered filling out this form for such an insignificant amount of time***.

4. After customers leave, I generally work until about midnight performing my closing tasks for the night. After I finish my work, I clock out, and head to the front of the store. I estimate that on at least three out of every five shifts, a manager is at the door when I arrive, and I can exit immediately. ***If a manager is not there, I simply page one of the managers and ask to have the door opened. Usually, I only wait about three to five minutes for the manager to arrive***. To the best of my recollection, I have never waited longer than five minutes to be let out of the store.

(Alonzo Decl., Dkt. 78-4, at ¶¶ 2, 4.)  Again, when a manager is paged to release employees like Alonzo, the

manager knows or should know that wait time without pay has occurred.**[8]**

### D.   Despite Discovery Requests That Should Have Resulted in the Production, Home Depot Has Submitted No Evidence That It Made Payments for Off-the-Clock Time Spent Waiting to Be Released from Locked Stores

Home Depot obtained declarations confirming it knows off-the-clock time occurs at the end of store

closing shifts.  However, Home Depot offered no commensurate evidence that these employees were paid

before or after submitting declarations.  While it is enough to say Home Depot *should* have provided the

evidence to back up its assertions and its declarants' assertions about payment policies and practices, Home

Depot actually had an *obligation* to do so.  Plaintiff requested that information in discovery in multiple ways.

### 1.   Plaintiff's Interrogatory 4 (Set Two) and Request for Production 4

When asked to state its reasons why this case should not be certified as a class action, Home Depot

said, in its Supplement Response to Interrogatory No. 4 (Set Two):

During the relevant period, defendant maintained policies prohibiting off-the-clock work and requiring plaintiff and the putative class members to accurately record their working time, including after store closing, and ensuring payment for all time worked. Plaintiff and putative class members are permitted to leave the store promptly after clocking out. ***If an associate is required to wait to exit the store after clocking out for any reason, he or she is required to submit a time and attendance change request form to ensure payment for all time worked***. . . .

Plaintiff's claims that he and putative class members were forced to work off-the-clock, because they had to wait at the store exit due to bag checks or because the doors were locked after store closing, necessitate individualized inquiries to determine whether any wage and hour violations occurred, including but not limited to ***whether individual class members had***

---

**[8]** Notably, Home Depot claims off-the-clock time is a "***major violation***" that is grounds for firing: "Violation of Home Depot's off-the-clock policy is considered a 'major violation' of the Company's Standards of Performance and is grounds for discipline, including termination."  (Pennington Decl., Dkt. 77-6, at ¶ 4.)  Setting aside substantial evidentiary issues permeating the declaration, it is striking that Home Depot has offered declarations of associates and managers that purport to confirm "***major violation***" conduct but, apparently, no disciplinary action was undertaken.

*to wait to exit after clocking out and, if so, why; whether individual class members filled out time and attendance change request forms to request payment for any time spent waiting; if not, why not; whether Home Depot had knowledge of the alleged "off-the-clock" time; and whether individual class members were paid for time spent waiting*. . . .

Documents that support defendant's contention that this case should not be certified as a class action include but are not limited to defendant's policies regarding timekeeping, security, store closing, and payment of regular and overtime wages . . . *Certain personnel, timekeeping and pay records for putative class members may also be used to oppose class certification*. . . .

(Leviant Decl., Exh. 75, emphasis added.)  Separately, Plaintiff requested production of all documents referred to in Home Depot's Interrogatory responses. (Leviant Decl., Exh. 77.)  If, as Home Depot contends, employee were required to submit adjustment forms, it should have produced them.  It didn't.  If, as Home Depot contends, it was a policy that every employee was paid for all time spent waiting to be released, it should have produced evidence of that.  It didn't.  Instead, Home Depot tries to ignore its unwaivable duty to pay for all time employees spend under its control and hopes that the "*why*" questions it poses about adjustment forms have legal significance.  Without doubt, its questions are irrelevant, just as there is no reasonable doubt that Home Depot knew of off-the-clock work; a manager can't be paged to release employees – or come upon an employee waiting to be released – and not know that wait time occurred.

### 2.      Plaintiff's Interrogatory 10

When asked to identify persons with knowledge about the claim or defenses to this action, in its Home Depot identified only two individuals as definitively having that knowledge, Ms. Barnaby and Ms. Pennington, who were also designated to testify pursuant to Fed. R. Civ. P. 30(b)(6).  (Leviant Decl., Exh. 76.)  The only two individuals that Home Depot was able to identity by name as having knowledge about the claims and defenses in the matter were the two individuals designated to testify for Home Depot.

### E.      Home Depot Uses a Sophisticated Kronos System as the Timeclock to Track Employee Time

Home Depot is aware of the on-the-clock time recorded by its employees because Home Depot utilizes the well-known Kronos system as its timekeeping system:

**Q**. (By Mr. Setareh)  The computer calculates the rule that you just identified?

**A**. The rules are identified in Kronos.

**Q**. And can you please describe for us what Kronos is.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1    **A**. Kronos is our timekeeping system.

2    **Q**. And how does Kronos work? Can you please briefly explain that.

3    **A**. Those rules are set up and configured in Kronos based on the policy of the minutes
     identified earlier that are set out in the SOP.

4

5    **Q**. Okay.· But what does Kronos do?· Kronos keeps track of -- what does it keep track of?

6    **A**. So it is our timekeeping system where associates clock in and out for the day.

7    (Leviant Decl., Exh 1: Barnaby Depo., at 27:10-24.)

8

9    **III.**   **DISCUSSION**

10        **A.**    **Resolution of the Liability Issue, Separate from Classwide Damages, Is Authorized**

11               **Under Both Fed. R. Civ. P. 56 and Class Action Management Jurisprudence**

12               **1.**    **The Standard for Motions for Summary Judgment/Adjudication**

13        Rule 56 provides a means to dispose of cases, claims *or issues* where "there is no genuine issue as to

14   any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);

15   *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the moving party has shown the

16   absence of a genuine issue of material fact, the non-movant cannot avoid judgment by resting on mere

17   assertions -- unsupported by record evidence -- that the facts suffice to support its claims. *See Lujan v. Nat'l*

18   *Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Instead, "the nonmoving party must come forward with 'specific

19   facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475

20   U.S. 574, 587 (1986) (emphasis in original)). Summary adjudication of issues is available where a party seeks

21   adjudication of certain issues rather than judgment on entire claims. *See, e.g., Time Warner Entertainment-*

22   *Advance/Newhouse Partnership v. Steadfast Orchard Park, L.P*., No. ED CV 07-473, 2008 WL 4350054, *6

23   (E.D. Cal. Sept. 23, 2008) (granting plaintiff's motion as to several issues). Here, Plaintiff and the Classes are

24   entitled to summary adjudication that Defendant is liable for the payment of wages for off-the-clock time

25   spent under Defendant's control (1) at the beginning of shifts, and (2) at the end of shifts concluding after

26   Home Depot stores close to the public at night. This ruling will substantially narrow the issues for trial on

27   Plaintiff's Claim for unpaid wages, which will then focus only on (1) a robust calculation of classwide

28   damages demonstrated with the assistance of Plaintiff's statistics and survey expert and (2) derivative claims

dependent upon the underlying unpaid wage Claim.

**2.     Courts Managing Class Actions Routinely Bifurcate Liability and Damages to Efficiently Manage Issues**

The resolution of classwide liability, separate from a determination of classwide damages, is not unusual in the class action context:

> We also conclude that separation of the trial on individual damage issues from the class trial in this securities fraud class action is not a novel procedure, nor in contravention of the Seventh Amendment. Bifurcation of the trial of liability and damage issues is well within the scope of a trial court's discretion under Fed.R.Civ.P. 42(b). *Crummett v. Corbin*, 475 F.2d 816, 817 (6th Cir. 1973); *Idzoitic v. Pennsylvania Railroad Company*, 456 F.2d 1228, 1230 (3d Cir. 1972); *Moss v. Associated Transport Inc.*, 344 F.2d 23 (6th Cir. 1965). The separation of the trial on the damage issues from the class trial will, in these cases, serve the ends of "economy and expedition."

*Arthur Young & Co. v. U. S. Dist. Court*, 549 F.2d 686, 697 (9th Cir. 1977).  Beyond being merely permissible, it is frequently more efficient to separate a determination of class damages from a determination of liability, resulting in the acceptance of that case management procedure:

> According to the authors of the leading treatise on class actions, most courts adjudicating civil rights class actions in the employment discrimination context opt to bifurcate the liability and damages phases of the trial. 5 H. Newberg, Class Actions § 24.123, at 24–414–416 (3d ed. 1992). *See, e.g., Teamsters v. United States*, 431 U.S. 324, 360–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977); *Harriss v. Pan American World Airways*, Inc., 74 F.R.D. 24 (N.D.Cal.1977); *Barefield v. Chevron*, 1988 WL 188433, 1988 U.S.Dist. LEXIS 15816, 48 Fair Empl.Cas. (BNA) 907 (N.D.Cal.1988).

*Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 458–59 (N.D. Cal. 1994), *as amended on denial of reconsideration* (Sept. 15, 1994).   This is as true in the wage and hour context as it is in class actions arising under securities laws or employment discrimination.  *See, e.g., Lopez v. G.A.T. Airline Ground Support, Inc.*, No. 09CV2268-IEG BGS, 2010 WL 3633177, at *12 (S.D. Cal. Sept. 13, 2010) (As part of a certification order in a wage and hour class action, the Court said, "In addition, if necessary, the Court can bifurcate liability from damages for purposes of trial.")

**B.** **The "Control" Element of the California Wage Orders' Disjunctive Compensation Test Resoundingly Supports Plaintiff's Motion, Due to the Expansive Meaning of "Control" Incorporated into California's Wage Laws**

The Industrial Welfare Commission ("IWC") "is the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California." *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557, 561 (1996), citing Lab. Code, §§ 1173, 1178.5, 1182. The "IWC has promulgated 15 [industry and occupation wage] orders—12 orders cover specific industries and 3 orders cover occupations—and 1 general minimum wage order which applies to all California employers and employees (excluding public employees and outside salesmen). [Citations.]" *Monzon v. Schaefer Ambulance Service, Inc*., 224 Cal. App. 3d 16, 29 (1990). "All 15 wage orders contain the same definition of 'hours worked' as does Wage Order No. 14–80, except for IWC wage order Nos. 4–89 and 5–89, which include additional language." *Morillion*, 22 Cal. 4th at 581, citing Cal. Code Regs., tit. 8, §§ 11040, subd. 2(H), 11050, subd. 2(H).

"Under California law, compensable time is 'the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.' " *Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578 (2000) (quoting Cal. Code Regs., tit. 8, § 11140, subd. 2(G)). The standard is expressed in the disjunctive, meaning that "time is compensable when an employee is working *or* under the control of his or her employer." *Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578. Thus, California's compensable-time standard encompasses two categories of time:

> First, time is compensable if an employee is "under the control" of his or her employer, whether or not he or she is engaging in work activities, *such as by being required to remain on the employer's premises or being restricted from engaging in certain personal activities*.

*Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578 (emphasis added). Importantly, "an employee who is subject to an employer's control *does not have to be working during that time to be compensated*. . . ." *Morillion*, 22 Cal. 4th at 582 (emphasis added). "Second, time is compensable if an employee 'is suffered or permitted to work, whether or not required to do so.'" *Sali*, 889 F.3d at 637, citing *Morillion*, 22 Cal. 4th at 578.

The adoption history of the "control" test shows that the IWC deliberately abandoned less-protective

prior language, under which only certain listed "required" acts were compensable, and replaced it with the broader, present-day "control" test.  The IWC's deliberate choice to jettison the word "require" and replace it with "control" was not a meaningless amendment.  Courts do not presume that regulatory bodies like the IWC make pointless changes to the text of their regulations.  *See*, *e.g.*, *Viking Pools, Inc. v. Maloney*, 48 Cal.3d 602, 609 (1989); *Stafford v. Realty Bond Service Corp.*, 39 Cal.2d 797, 805 (1952).  This is particularly unlikely in the IWC's case, given that any textual changes to the Wage Orders must be preceded by extensive, statutorily-mandated proceedings, including multiple public hearings.

The IWC's chosen word "control" is broad enough to encompass "required" actions, while also embracing those that are "directed," "restrained" or "regulated" by an employer.  Significantly, it is possible to "direct" a non-"required" activity.  The plain-language definition of the word "direct" includes to "guide (something or someone),"[9] and to "manage," "regulate," "supervise or oversee."[10] Thus, "control" captures a broader set of concepts reflecting the imposition or application of authority in different degrees. It is not limited to "required" or "compulsory" actions.  For example, a police officer may "direct" a driver who chooses, but is not required, to turn left.  The noun form of the word, "direction," includes both "[a]n act of guidance" and "an instruction on how to proceed"[11]—neither of which presupposes a "required" or "compulsory" act.

In short, the words "control," "require," and "direct" are not interchangeable synonyms.  The IWC selected the phrase "subject to the *control* of an employer," not "subject to the requirement" or "direction of an employer."  It chose this word knowingly, in order to "broaden" the definition of compensable "hours worked."

When the IWC chose to *remove* the word "require" from the first prong of the compensability test in 1947, and *replace* it with the broader word "control,"  the amendments achieved the IWC's goal of "broadening" the definition of compensable "hours worked," while also making plain that "required" activity

---

[9]   *Black's Law Dictionary*, "direct," *vb.*, sense 3 (10th ed. 2014) ("to guide (something or someone); to govern").   CELC cites sense 4 of this definition.  *See also American Heritage Dictionary*, "direct," *v.tr.*, sense 2 (5th ed. 2018) ("give guidance and instruction to").

[10]   *American Heritage Dictionary*, *supra*, "direct," *v.tr.*, sense 1.

[11]   *Black's*, *supra*, "direction," *n.*, senses 3, 4; *see also American Heritage Dictionary*, *supra*, "direction," *n.*, sense 1 ("management, supervision or guidance of a group or operation").

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

1   is not a part of *either* prong of the test.

2         The final phrase of the compensability test ensures that the "suffered or permitted to work" test

3   encompasses both "required" and non-"required" "work"—so long as the "work" was "suffered or permitted"

4   by an employer, which means the employer knew or should have known it was occurring.  *Morillion*, 22 Cal.

5   4th at 584-85.  An employer who sits by passively while an employee engages in unrequested "work" must

6   nevertheless compensate the employee for all of that "work."  The "control" test, in contrast, is not limited to

7   "work," but instead embraces all "*time* during which an employee is subject to the control of the employer."

8         Each word and phrase of the "control" test plays a role.  The word "time" makes plain that non-

9   "work" that the employer decides to "control" is compensable, such as the bus-ride time in *Morillion*.  *Id.* at

10  582.  The phrase "during which" directs the focus onto the "controlled" time itself, not what may have

11  preceded.  The phrase "subject to" ensures that on-call time, for example, is compensable.[12]  And the word

12  "control," which the IWC selected to replace the narrower word "require," ensures that all "controlled" time,

13  whether "required" or not, is treated as compensable.

14        The two "independent" tests (*Morillion*, 22 Cal. 4th at 582) thus function together to protect

15  employees broadly and ensure they are compensated for all "hours worked."  "[T]he IWC in defining 'hours

16  worked' appeared to give little weight to the customary employment practices that informed Congress's

17  decision to enact the Portal-to-Portal Act and ***instead placed more importance on the policy of ensuring that***

18  ***employees are fully compensated for all time spent in the employer's control***."  *Troester v. Starbucks Corp.*,

19  5 Cal. 5th 829, 845 (2018), *as modified on denial of reh'g* (Aug. 29, 2018) (emphasis added).

20        Consistent with the broadly accepted construction of *Morillion*, the California Supreme Court, in

21  *Mendiola*, recognized that time during which security guards were required to remain on site was "controlled"

22  under *Morillion*, even though the guards could have avoided this "control" by requesting permission "to leave

23  the worksite."  *Mendiola*, 60 Cal.4th at 837, 841.  The Court reached this conclusion because, under the Wage

24

25    [12]   *See, e.g.*, *Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal. 4th 833, 840-41 (2015) ("on call" time
      can meet Wage Order's "control" test and be compensable although no "work" is occurring); *Black's*,
26    *supra*, "subject," senses 2, 3 ("exposed, liable, or prone" to something; "dependent on or exposed to
      (some contingency)"); *Merriam-Webster's Collegiate Dictionary*, "subject to" (11th ed. 2003) ("affected
27    or *possibly* affected by (something)" (emphasis added)), *cited in Augustus v. ABM Sec. Servs., Inc.*, 2
      Cal. 5th 257, 265 (2016), as modified on denial of reh'g (Mar. 15, 2017)   An employee engaged to wait
28    must be compensated for that *time*, even though no "work" is occurring.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED
CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

Orders, "the extent" or "level" "of the employer's control" during the time in question is what is

"'determinative.'" *Id.* at 840 (quoting *Morillion*, 22 Cal.4th at 587 (ellipsis in original); citing *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal.App.4th 1524, 1535 (2008); *Bono Enterprises, Inc. v. Bradshaw*, 32 Cal. App. 4th 968, 974-75 (1995).

Clearly establishing that the "control" element is readily established even with limited or avoidable "control," the employees in *Bono* could have avoided the restraint of otherwise mandatory on-site meal periods by making "prior arrangements to reenter the plant after leaving for lunch." *Bono*, 32 Cal. App. 4th at 972. This distinction was "extremely significant," because those employees who *did* make such "prior arrangements" were not "subject to the employer's control." *Id.* at 978 n.4. Nevertheless, consistent with the rule that the Wage Orders "must be liberally construed to accomplish" the "primary objective of protecting workers," the time was held compensable in *Bono*. *Id.* at 974-75.

Here, however, employees locked in a Home Depot store at night lack even the option to request permission to leave the worksite that was the focus of analysis in *Mendiola*. And, when compared to the facts in *Bono*, where "control" was established, the "control" exercised by Home Depot is greater still in this matter, given that there is no analogous means of requesting relief from Home Depot's procedures. Employees, who are under Home Depot's "control" from the moment they set foot in a store, clock in *after* donning their aprons, as directed by Home Depot. And employees leaving stores after hours must wait to be released from stores locked in accordance with Home Depot's store security policies.

**C.    Defendant Exercised Control Over the Members of the Class When, As a Matter of Policy, It Directed Their Pre-Clock In Activity, Thereby Assuming an Obligation to Compensate the Class Members for All Such Time Spent Under Its Control**

As this Court saliently noted, Home Depot's liability for unpaid wages due to off-the-clock work at the start of the shift turns entirely on the question of whether Home Depot placed Class Member under control when they entered a Home Depot store:

> Here, because Utne does not allege that putative class members are performing any specific work tasks between the time they enter the Home Depot store and the time they clock in (aside from donning their aprons), the common question is whether they are under Home Depot's "***control***".

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

(Dkt. 92, at 6, emphasis added.)

The Home Depot Associate Orientation Guide instructs associates as follows:  "***Associates are not permitted to remain in the store unless they are working or shopping***."  (Leviant Decl., Exh. 4, at Bates No. HD-UTNE-0001104 (emphasis added).)  Continuing, the Guide states:

> ***Remember that you should arrive fully prepared to begin your shift. In stores, associates should put on their aprons just before clocking in***.

(Leviant Decl., Exh 4 (emphasis added).)  As explained by Christine Pennington, Senior Director of Employment Practices and Associate Relations for The Home Depot, Home Depot's policy mandate is that Associates must first get their Home Depot aprons and then clock in at the timeclock: "When an associate arrives at the start of their shift, they need to go to the back, get their apron, put it on, go to the time clock and clock in."  (Leviant Decl., Exh 2: Pennington Depo., at 37:7-10.)  This was not inartful phrasing.  Home Depot expects Associates to (1) go to the back of the store, (2) go to a locker, (3) get an apron, (4) put it on, and ***only then*** (5) clock in:

> **Q**.  What does it mean when it says, "In stores, associates should put on their aprons just before clocking in"?  That's at the top of the page, how to clock in.
>
> **A**.  So these are hourly and, again, this is an orientation guide from 2013.· And we have other ·businesses that are not stores.· So it says, "In stores, associates should put on their apron just before clocking in."· I'm not sure if in 2013 this was the guide that was being used for both stores and non-stores.· But what that means is, if you work in a store, you need to go to the back, go to your locker, put your apron on and then immediately go to clock -- clock in.
>
> **Q**.  So as soon as somebody enters a store, they should be going towards the time clock to clock in?
>
> **A**.  Typically, yes, they should be going to get their apron and then go to clock in.

(Leviant Decl., Exh 2: Pennington Depo., at 35:7-25.)  Associates are not provided a grace period for personal activity after clocking in for work.  (Leviant Decl., Exh 2: Pennington Depo., at 40:1-4.)  And Home Depot could not identify a store that deviated from the pattern of placing the timeclock at the back of the store.  (Leviant Decl., Exh 2: Pennington Depo., at 33:5-13.)

Home Depot produced nothing during discovery that would contradict its express, written policies that (1) govern all time Associates spend in Home Depot stores, and (2) direct Home Depot employees to travel to the back of the store, go to a locker, get their apron, don their apron, and only *then* go to the timeclock to clock in for their shift.  Home Depot provided no wage adjustment forms as circumstantial

evidence that a widespread policy exists to time records to capture off-the-clock time. (Leviant Decl, ¶ 5.) Home Depot provided no written policies regarding shift start procedures or store closing procedures that contradict those discussed herein. (Leviant Decl, ¶ 6.)

Even the material submitted by Home Depot in opposition to Class Certification would not rebut the undisputed facts identified herein.  First, that Home Depot located a few current employees among its tens of thousands of employees willing to declare that they engaged in personal activity after entering a store but before clocking in does not negate Home Depot's broader liability for uncompensated time that it controlled employees generally.  At best, it shows that the damages owed to the individuals relating these anecdotal instances might be lower or different than the damages owed to the vast majority of Hourly Employee Class members that complied with the direction to enter the stores, walk to the rear, go to their locker, get their apron, don their apron, and *then* go to the timeclock to clock in. Anecdotes do not insulate Home Depot from a finding of classwide liability.[13]

There is also no identified process that would permit the Hourly Employee Class, on the whole, to avoid Home Depot's control before their shifts start.  Both *Bono* and *Mendiola* discussed circumstances where employees had some means of avoiding all of the employers' control in those cases and *still* concluded that sufficient control was imposed to render the time in question compensable.  Here, the Hourly Employee Class does not even have limited methods of avoiding the control imposed by Home Depot's policies.  From the moment they arrive in the store, they are expressly controlled: "***Remember that you should arrive fully prepared to begin your shift. In stores, associates should put on their aprons just before clocking in***." (Leviant Decl., Exh 4 (emphasis added).)

**D.**    **Defendant Exercised Control Over the Members of the Lock-In Class When, As a Matter of Policy, It Precluded Them from Leaving the Store at Night Immediately After Clocking Out, Thereby Assuming an Obligation to Compensate the Lock-In Class Members for All Such Time Spent Under Its Control**

It is beyond dispute that, as a matter of express written policy, once a Home Depot Store closes to the

---

**13** Plaintiff's damage showing will capture sufficient data to take into account the anecdotal outliers whose damages are different or lower than the majority of Class members.

public for the evening, Home Depot policy requires that all doors should be locked.  (Leviant Decl., Exhs. 5, 78-81, at p. 6 of each.)  Once locked, a limited number of supervisors have a key to let employees out, including a store manager, or the assistant store manager, or key-carrying supervisor. (Leviant Decl., Exh 2: Pennington Depo., at 50:8-18.)

As described in declarations submitted herewith, members of the Lock-in Class were instructed to clock out, *then* put away their apron, *then* travel to the front of the store where they would either wait with other departing employees until a manger let them out of the locked store or would page a manager with a key to let them out of the locked store. In either case, associates estimated spending substantial amounts of time off-the-clock waiting to be released.  *Id*.  Home Depot **knows** that Lock-in Class members spend time waiting off-the-clock to be released because, according to Home Depot, associates needing to be released from the locked store can "go to the front of the store and wait for the manager or page the manager using either what's called a first phone or the overhead paging system that they're there. . ." (Leviant Decl., Exh 2: Pennington Depo., at 51:19-24.)  Even declarations previously collected by Home Depot confirm Home Depot's knowledge that employees spend some time waiting to be released from locked stores.

Declarant Alvarez declares that, at times, he would wait for a manager to walk by to release him. (Alvarez Decl., Dkt. 78-5, at ¶ 7.)  And, while Declarant Alvarez gratuitously offers that "No manager is aware that I am waiting," this is demonstrably false, as he states that he will "just wait for a manager to walk by" when waiting alone.  As a matter of simple logic, the manager can observe that he is waiting to be let out. In another example, Declarant Alonzo also confirms that Home Depot knows that he has had to wait to be released from a locked store, sometimes as long as five minutes. (Alonzo Decl., Dkt. 78-4, at ¶¶ 2, 4.)  Again, when a manager is paged to release employees like Alonzo, the manager knows or should know that wait time without pay has occurred.

Home Depot appears to view its knowledge that employee routinely must wait to be released from locked stores as an irrelevancy. Home Depot expressly stated under oath in its discovery responses that, despite certainly having an awareness that employees can be locked in a store, off-the-clock (as evidenced by the manager declarations it obtained and discussed above), it nevertheless places the burden of accurate compensation on the employees:  "If an associate is required to wait to exit the store after clocking out for any reason, he or she is required to submit a time and attendance change request form to ensure payment for all

time worked."  (Leviant Decl., Exh. 75, at 4:2-4.)  Such burden shifting by an employer onto employees is unlawful.  *Troester*, 5 Cal. 5th at 848.

Because Home Depot directs as a matter of policy that stores must be locked after they are closed to the public, and because Home Depot chose to place its timeclocks at the rear of its stores, the Lock-In Class Members have no feasible way to avoid this "controlled" time spent waiting, off-the-clock, to be released from locked stores.  That this waiting may not occur for every employee on a nightly basis does not diminish the fact that it is a recurring event for which Home Depot, and not the Class, is obligated to recognize as triggering its obligation to compensate its employees for that controlled time.

**E.**     **Pursuant to Recent California Supreme Court Authority, a De Minimis Defense Is Not Available to Home Depot, Since Very Short Periods of Time That Can be Captured or Occur Regularly Must Be Compensated**

The California Supreme Court, when commenting on whether California law is concerned with tiny amounts of unpaid time, recently said, "[W]e observe that the regulatory scheme of which the relevant statutes and wage order provisions are a part is indeed concerned with "small things."  *Troester*, 5 Cal. 5th at 844.  The guidance supplied by *Troester* is clear; *Troester* stands for the proposition that all time worked must be paid, and it is the employer's burden to demonstrate that it has done everything possible to capture even small amounts of time.

*Troester* rejected the application of any de minimis rule when the law at issue is focused on small amounts: "We have said that application of a de minimis rule is inappropriate when 'the law under which this action is prosecuted does care for small things.'"  *Troester*, 5 Cal. 5th at 844, quoting *Francais v. Somps*, 92 Cal. 503, 506 (1891).  Applicable to this matter, *Troester* then observed that "the regulatory scheme of which the relevant statutes and wage order provisions are a part is indeed concerned with 'small things.'"  *Troester*, 5 Cal. 5th at 544.  Examining its decision in *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 265 (2016), *as modified on denial of reh'g* (Mar. 15, 2017) as a source of guidance, *Troester* recognized that "the strict construction of a law prohibiting any interference with or reduction of a 10-minute rest break is difficult to reconcile with a rule that would regard a few minutes of compensable time per day as a trifle not requiring compensation if too inconvenient to record."  *Troester*, 5 Cal. 5th at 844-45.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

Because *Troester* arose in a case where several minutes of unpaid time was at issue, the Court necessarily discussed "minutes" in its opinion.  But *Troester* did not specify a floor below which employees need not be compensated.  Instead, *Troester* analyzed where the burden to capture should lie, holding that it lies with the employer:

> We recognize that one of the main impetuses behind the *de minimis* doctrine in wage cases is "the practical administrative difficulty of recording small amounts of time for payroll purposes." (*Lindow, supra*, 738 F.2d at p. 1062; see 29 C.F.R. § 785.47 (2018) [insignificant periods of time "which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded"].) But ***employers are in a better position than employees to devise alternatives that would permit the tracking of small amounts of regularly occurring work time***. One such alternative, which it appears Starbucks eventually resorted to here, was to restructure the work so that employees would not have to work before or after clocking out. Moreover, as noted, technological advances may help with tracking small amounts of time. An employer may be able to customize and adapt available time tracking tools or develop new ones when no off-the-shelf product meets its needs. And ***even when neither a restructuring of work nor a technological fix is practical, it may be possible to reasonably estimate work time—for example, through surveys, time studies, or, as See's Candy suggested, a fair rounding policy—and to compensate employees for that time***. Under the circumstances of this case, we decline to adopt a rule that would require the employee to bear the entire burden of any difficulty in recording regularly occurring work time.

*Troester*, 5 Cal. 5th at 848 (emphasis added).  But, to the extent the majority opinion does not make it clear that *Troester* should not be read as setting a compensability floor at "minutes" of time, the concurring opinion of Justice Cuéllar makes it abundantly clear, in his discussion of the "rule of reason" proposed by Justice Kruger, that even a few seconds of regularly occurring time, "*or fractions of them*," should not readily escape the obligation to compensate under California law when it is possible to pay for that time:

> The rule of reason is best not described as a de minimis rule, because ***embracing that label risks blurring the distinction between the quite limited extent of the reasonableness inquiry under California law and a federal de minimis doctrine*** with a particular content—including reliance on administrability—that does not necessarily converge with California's legal commitments. Those commitments protect workers from being forced to engage in uncompensated work even as they also offer some recognition that ***certain spare seconds or fractions of them*** spent on arguably work-related activities may not always merit compensation.

*Troester*, 5 Cal. 5th at 850 (concurring opinion of J. Cuéllar; emphasis added).  Continuing, Justice Cuéllar said about the intent of the majority opinion:

> [I]t observes that employers have the burden of tracking potential work time occurring on a "regular basis" or that is "a regular feature of the job," and in doing so, rightly focuses on reasonable solutions such as smartphone apps or rounding strategies for tracking these regular amounts of time.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

*Troester*, 5 Cal. 5th at 852.  With direct application here, Justice Cuéllar summarized the intent of the majority's opinion:

> California law still protects workers from being forced to undertake work that won't be paid. That protection is not diluted if it remains possible for employers to argue against liability ***for moments so fleeting that they are all but imperceptible***. Courts may sometimes find employers' arguments to have merit in light of a context-dependent inquiry focused on the extent to which the time in question can be meaningfully perceived, the quantity and regularity of the uncompensated work over time, as well as the nature of the employee's job responsibilities and related factors. What we know is that ***regular minutes worked by employees off the clock do not come close to being treatable essentially as rounding errors under a sensible application of a rule of reason***.

*Troester*, 5 Cal. 5th at 853 (emphasis added).

While the time at issue here exceeds "just seconds" of time, even such amounts of time are encompassed by the analysis in *Troester*, particularly where the unpaid amounts occur with any regularity and *could* be captured by the employer.  First, as Justice Cuéllar clarified when discussing the intent of *Troester*, the time at issue here is encompassed within *Troester*, since a couple of minutes does "***not come close to being treatable essentially as rounding errors***."  *Troester*, 5 Cal. 5th at 853 (emphasis added).  Second, in this matter, the record supports a finding that the off-the-clock time was on the order of at least several minutes a day, and not the "spare seconds" viewed by *Troester* as potentially too small to require compensation.

Even prior to the *Troester* decision, the Ninth Circuit clearly held that a *de minimis* defense did not apply unless an employer established that: (1) the amount of time spent on the additional work was small, (2) the administrative difficulty in recording time was substantial, (3) the size of the aggregate claim was also small, and (4) the work did not occur with any regularity.  *Lindow v. United States*, 738 F.2d 1057, 1062-64 (9th Cir. 1982).  The federal *de minimis* doctrine was also addressed in federal regulations, at 24 C.F.R. § 785.47, though even the Wage and Hour Division of the Department of Labor, issuing its regulation in 1961 confirmed that the *de minimis* doctrine did not apply where an employer arbitrarily refused to count all hours worked:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (*Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. ***An employer may not arbitrarily fail to count as hours worked any part,***

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF ALL CERTIFIED CLASSES AS TO THE FIRST CLAIM FOR RELIEF IN THE THIRD AMENDED COMPLAINT**

*however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.*

29 C.F.R. 785.47. (Emphasis added.)  Citing this regulation, *Lindow* held that regularly occurring work is unlikely to fall beneath the *de minimis* threshold.  *Lindow*, at 1063.  Thus, long before *Troester* confirmed the obvious, that California law does not incorporate a federal *de mminis* defense to wage payments, Home Depot knew that the *de minimis* defense was rejected as a defense to payment of time worked, "however small," that regularly occurred.

In short, according to *Troester*, Home Depot (1) did what the California Supreme Court said Home Depot *should not* do and (2) failed to do what the California Supreme said it should have done.  Home Depot shifted the adverse consequences of its timeclock placement decision and its donning policy onto employees.  And, Home Depot made no effort to implement any system to capture the amounts of time that members of the Classes spent complying with donning rules or waiting to be released from locked Home Depot stores.  Under California law, Home Depot has no *de minimis* defense to the claims in this matter.

## IV.    **CONCLUSION**

No genuine issue of fact exists as to whether Defendant is liable to employees in the Classes for time spent off-the-clock under Defendant's control. Accordingly, the Court should summarily adjudicate the issue of liability in Plaintiff's favor.


Dated: November 7, 2018                        **SETAREH LAW GROUP**

                                               By: _____
                                               Shaun Setareh
                                               H. Scott Leviant
                                               Thomas Segal

                                               Attorneys for Plaintiff